884 P.2d 414

VAN VELSON CORPORATION, aka Van Velsor Corporation, Plaintiff–Counter-defendant–Appellant–Cross–Respondent,

v.

WESTWOOD MALL ASSOCIATES, a New York Partnership, Isaack Bernstein, Isaac Perlstein, Martin Freidman, Fischel Bernstein, Munkas Tora Academy, individually and as partners in Westwood Mall Associates; National Bank of Detroit; Valley Bank; West One Bank, Defendants–Counterclaimants–Respondents–Cross–Appellants.

No. 20297.

Supreme Court of Idaho,
Twin Falls, March 1994 Term.

Oct. 27, 1994.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for appellant/cross-respondent. Fred J. Lewis, argued.

Ward, Maguire & Bybee, Pocatello, for respondent/cross-appellants. David H. Maguire, argued.

SILAK, Justice.

Van Velson Corporation (Van Velson) initially filed this suit as a foreclosure action against Westwood Mall Associates (Associates) claiming that Associates had defaulted on a $400,000 loan. Van Velson sought to recover the principal and interest on the loan, plus costs and attorney fees, and also to foreclose on the Westwood Mall property which Associates had mortgaged to secure the loan. Associates answered and counter-claimed, asserting that Van Velson had defaulted on a separate agreement with Associates to purchase the Westwood Mall and to use the $400,000 as a down payment on the purchase price, and as a result of Van Velson's default Associates was entitled to retain the $400,000 down payment as liquidated damages. The district court denied Van Velson's motion for summary judgment and granted summary judgment to Associates on their cross-motion.

## I.

## FACTS AND PROCEDURAL BACKGROUND

On July 12, 1985, Associates, a partnership existing under the laws of New York, con-tracted to purchase the Westwood Mall in Pocatello, Idaho, from Floribec International Corporation, a Florida corporation. The closing date for this transaction was set for November 27, 1985. During the Fall of 1985 Associates and Van Velson, a New Jersey corporation, attempted to negotiate an agreement in which Van Velson would purchase Associates' rights in the Floribec/Associates purchase agreement. However, Van Velson and Associates were unable to reach an agreement prior to the closing between Associates and Floribec on November 27, 1985. Nevertheless, Van Velson and Associates did agree, by letter agreement dated November 26, 1985, that Van Velson would loan Associates $400,000 to enable Associates to close with Floribec. The parties further agreed they would continue to negotiate in an effort to reach an agreement whereby Van Velson would purchase the Mall from Associates, in which case the $400,000 mortgage would be applied as Van Velson's down payment on the Mall. Van Velson's loan to Associates was secured by a mortgage on the Westwood Mall property in case Van Velson and Associates could not consummate the sale of the Mall to Van Velson.

The parties originally agreed that if they could not close the transaction by December 23, 1985, Associates would immediately pay back the $400,000. The closing date was extended a number of times. On March 21, 1986, Van Velson's attorneys, Steve Harvis and Fred Umane from the New York law firm Harvis & Zeichner, sent to Associates' attorney, Joseph Hershkowitz of the New York law firm Frenkel & Hershkowitz, four duplicate originals of a purchase agreement, signed by Van Velson's president, Michael Bland. The cover letter for these contracts read as follows:

Dear Joe [Hershkowitz]:

Enclosed are four duplicate original contracts of sale for the Westwood Mall duly executed by Michael Bland, President of Van Velsor Corp. These documents are delivered to you subject to our approval of your comments and our review of the Floribec and Idaho Mortgage Holders Mort-

gages [first and second mortgages on the Mall]. Kindly contact us at your earliest convenience with your comments.

Please note that we have substantially revised the rider to the Associate's Note for clarity and the protection of all parties.

Very truly yours,

Frederic H. Umane

By letter dated March 24, 1986, Hershkowitz responded as follows:

Dear Fred [Umane]:

In accordance with Steve's [Harvis] request, I enclose herewith copies of the first and second mortgages and mortgage notes affecting the Westwood Mall property. Kindly review same and, assuming that you have no objection thereto, I will continue to work on the final revisions of the contract and, hopefully, forward to you a fully executed copy thereof today.

Sincerely,

Joseph M. Hershkowitz

On March 26, 1986, Shlomo Sharon and Michael Bland of Van Velson, and Isaack Bernstein of Associates, flew to Pocatello to inspect the Mall. The three men inspected the Mall on March 27, 1986, and during the inspection they discovered problems with large portions of the Mall's roof and parking lot. In a phone conversation later that day, Bernstein, of Associates, informed Sharon and Morris Kaiser, of Van Velson, that it would cost approximately $250,000 to make the repairs needed on the roof and parking lot. ·Sharon testified at his deposition that Kaiser told Bernstein during the phone conversation that because of the needed repairs to the Mall, he [Kaiser] was not going to proceed with the deal.

The next day, March 28, 1986, Harvis and Umane, for Van Velson, and Hershkowitz, for Associates, met in New York to finalize the terms of the agreement. The attorneys discussed and changed a number of terms of the contract. Harvis initialed those provisions in the contract which were changed in any way.

It is undisputed that another closing date, set for April 15, 1986, was postponed to May 15, 1986, at the request of Van Velson. By letter dated April 21, 1986, Hershkowitz advised Van Velson's attorneys that Associates would postpone the closing date to May 15, but that in light of management considerations in operating the Mall, time for closing the transaction was of the essence. By a letter dated May 9, 1986, Umane advised Hershkowitz that Van Velson rejected Associates' attempt to make time of the essence, asserting that there were several additional points to negotiate. Umane stated that Van Velson would be prepared to close on or about June 15, 1986. By letters dated May 29 and May 30, 1986, Hershkowitz advised Harvis that Associates, contrary to Hershkowitz's advice, would agree to extend the date of closing one last time, to June 15, 1986, time again being of the essence. In a letter to Hershkowitz dated June 12, 1986, Harvis stated the following:

... As you know, we have been meeting and discussing the open items relating to the closing of this transaction. We consider that the open issues are material and go to the essence of whether or not a contract between the parties actually exists. Thus, we categorically dispute your right to arbitrarily create a "time of the essence" closing date.

While we are endeavoring to reach a conclusion with you concerning these matters, until such time as that in fact occurs, we cannot accept your assertion that a closing of title is to take place on either June 15 or June 16, 1986. Accordingly, we trust that we can continue to work to try to resolve the outstanding issues and assuming that this occurs, set a closing date as appropriate.

On June 17, 1986, after Van Velson again failed to appear at closing, Hershkowitz wrote to Harvis informing him that it was Associates' position that Van Velson was in default on the parties' purchase agreement and that Associates no longer had any obligation to Van Velson for the $400,000. Inasmuch as Van Velson defaulted on the purchase agreement, Associates contends Van Velson forfeited its $400,000 down payment, pursuant to Section 8.12 of the purchase agreement which states:

*Liability of Purchaser.* Seller agrees that in the event of a default on the part of the Purchaser of this agreement to look solely

to the monies deposited by the Purchaser upon the execution and delivery hereof as liquidated damages, and not look to the Purchaser for any further liability in connection therewith.

On August 29, 1989, Van Velson filed a Complaint for Foreclosure against Associates claiming that the parties never reached an agreement for the sale of the Mall, and therefore Associates was in default on the $400,000 loan. Associates counterclaimed asserting that the parties had entered a valid purchase agreement, that Van Velson had defaulted on the agreement, and that Van Velson's default entitled Associates to retain the $400,000 down payment as liquidated damages. On October 18, 1989, Van Velson moved for partial summary judgment. The motion was continued, and the matter was subsequently set for a court trial on April 15, 1991. The trial date was subsequently vacated, and on March 19, 1992, Associates filed a cross-motion for summary judgment.

On July 21, 1992, the district court entered its Memorandum Decision and Order granting Associates' motion for summary judgment. The court concluded that the purchase agreement, which Van Velson's president Bland had executed and delivered to Associates, dated March 28, 1986, had been signed by Bernstein of Associates prior to or on the 28th. The court held that based on the undisputed facts in the record, this was a valid purchase agreement, Van Velson had breached the purchase agreement, and Associates was entitled to keep Van Velson's $400,000 down payment as liquidated damages. The court denied Van Velson's motion to alter or amend the judgment and entered judgment in favor of Associates, ruling that the $400,000 mortgage was satisfied and discharged. Van Velson appeals from this judgment and order. Associates cross-appeals from that portion of the judgment which denied its request for an award of attorney fees.

## II.

### ISSUES ON APPEAL

The following issues are presented for our decision in this appeal:

1. Whether the district court erred in concluding that the parties had formed a valid contract for the purchase and sale of the Westwood Mall, and that Van Velson had breached that agreement.

2. Whether Van Velson was entitled to, and did, properly terminate the purchase agreement by giving Associates timely notice that Van Velson was terminating the purchase agreement because of the Mall's state of disrepair.

3. Whether the district court's order cancelling Van Velson's recorded mortgage against the Mall is unenforceable because such a remedy is clearly in excess of any damages actually suffered by Associates.

4. Whether the district court should have granted Associates' request for attorney fees.

## III.

### ANALYSIS

**A. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO ASSOCIATES BECAUSE, BASED ON THE UNDISPUTED FACTS IN THE RECORD, THE PARTIES FORMED A VALID CONTRACT FOR THE PURCHASE AND SALE OF THE WESTWOOD MALL, AND VAN VELSON BREACHED THAT AGREEMENT.**

■ Having reviewed the record, we conclude that the district court did not err in granting summary judgment to Associates. The purchase agreement, dated March 28, 1986, was a valid enforceable contract; it identified the parties, the real property involved, and the price, and it was signed by the party to be charged.

■ The parties agree that New York law governs the contractual dispute. *See Reynolds v. Continental Mortgage Co.*, 85 Idaho 172, 178, 377 P.2d 134, 137 (1962). Under New York's Statute of Frauds, a contract for the sale of real property is void unless it is in writing and signed by the party to be charged. A written agreement satisfies the Statute of Frauds if it identifies the parties involved, describes the real property at issue, states the price, and is signed by the party to be charged. *Birnhak v. Vaccaro*, 47 A.D.2d 915, 367 N.Y.S.2d 792, 793 (1975). It is not necessary that the purchase contract

specify the exact date for closing or for paying the purchase price. *Id.* "An agreement complies with the Statute of Frauds if it contains 'substantially the whole agreement, and all of its material terms and conditions, so that one reading it can understand from it what the agreement is.'" *Dahm v. Miele,* 136 A.D.2d 586, 523 N.Y.S.2d 851, 853 (1988). It is sufficient for the Statute of Frauds if there is an ascertainable means by which the price term of the agreement can be established. *Id.*

In this case, the purchase agreement, dated March 28, 1986, identifies Van Velson as the buyer and Associates as the seller; it provides an accurate legal description of the Mall property; it states the price to be paid (Section 2.02 of the Agreement); it is signed by the authorized principals for Van Velson and Associates; and it was ultimately agreed upon and signed by March 28, 1986. Thus a valid contract was formed on March 28, 1986.

The district court properly disregarded Harvis's affidavit, in which he denied that Van Velson intended for the March 28, 1986 purchase agreement to constitute a contract for purchase. The district court correctly ruled that Harvis's "affidavit is more in the form of closing argument, highly conclusory, both as to fact and law, and although interspersed with some facts, and the conclusion that the contract was conditional is contradicted by the other facts that the court has been provided." The district court also properly relied on the fact that although the parties signed the agreement on March 28, 1986, and then twice postponed closings scheduled for April 15 and May 15, 1986, Van Velson never contended that a binding contract did not exist until June 12, 1986, at which time Van Velson's attorney indicated for the first time that the existence of a contract was questionable.

The district court correctly determined that all material terms of the Mall purchase contract were agreed upon as of March 28, 1986. The initialed changes made by Hershkowitz and Harvis on March 28, 1986, became part of the contract because they were in writing and the parties making them were acting on behalf of Associates and Van Velson. In any case, the initialed changes made by the attorneys did not change or modify any material terms of the agreement, and

therefore they do not affect the validity of the agreement. The contract, in all its material terms, was the same on March 28, when signed by Bernstein, as it was on March 21, when signed by Bland, president of Van Velson.

**B. BECAUSE VAN VELSON DID NOT GIVE ASSOCIATES TIMELY WRITTEN NOTICE THAT VAN VELSON WAS TERMINATING THE PURCHASE AGREEMENT, VAN VELSON CANNOT CLAIM THAT IT PROPERLY TERMINATED THE PURCHASE AGREEMENT BASED ON THE MALL'S STATE OF DISREPAIR.**

■ Section 8.14 of the purchase agreement provided that Van Velson could conduct an engineering inspection of the Mall and that if Van Velson determined, based on the engineering report, that the Mall was not in good repair and order, Van Velson could, in its discretion, terminate the purchase agreement, provided that Van Velson "advise" Associates of its intention to do so. Section 8.01 of the purchase agreement required that such advice or notice be in writing. Because the record reflects that Van Velson never advised Associates in writing that it was terminating the purchase agreement, the district court properly rejected Van Velson's contention that it was entitled to terminate.

The purchase agreement also provided that Van Velson could only terminate the agreement because the Mall was in disrepair if Van Velson had an engineering inspection performed and if Van Velson immediately informed Associates of the results of the engineering inspection. It is undisputed that Van Velson never had an engineering inspection performed.

**C. WHETHER THE DISTRICT COURT'S ORDER CANCELLING VAN VELSON'S RECORDED MORTGAGE AGAINST THE MALL IS UNENFORCEABLE BECAUSE SUCH A REMEDY WAS CLEARLY IN EXCESS OF ANY DAMAGES ACTUALLY SUFFERED BY ASSOCIATES.**

■ Van Velson does not dispute the purchase agreement's provision that in the event

**406**

Van Velson defaulted, the monies deposited would be forfeited as liquidated damages according to Section 8.12. Rather, in one of its briefs opposing summary judgment, Van Velson claimed that cancellation of its mortgage and forfeiture of the $400,000 down payment would constitute a penalty unenforceable under New York law. However, beyond the conclusory assertion in its brief, Van Velson provided no evidentiary matter or case precedent to the trial court as to why $400,000 constitutes an unenforceable penalty under the circumstances. Hence, Van Velson failed to raise any genuine issue of material fact on this theory. *E.g., McCoy v. Lyons,* 120 Idaho 765, 820 P.2d 360 (1991) (party opposing summary judgment may not rest on mere speculation, scintilla of evidence is not enough to create a genuine issue of fact).

## IV.

### ISSUE ON CROSS–APPEAL

**WHETHER THE DISTRICT COURT SHOULD HAVE GRANTED ASSOCIATES' REQUEST FOR ATTORNEY FEES.**

 In its memorandum decision and order, the district court, without discussion, ordered that neither party be awarded attorney fees. Associates has cross-appealed claiming it should have been awarded attorney fees under I.C. § 12–120(3), because it was the prevailing party in a commercial transaction dispute. The record reveals that Associates neglected to preserve this issue for appeal.

We have combed the trial record and nowhere find Associates seeking attorney fees specifically pursuant to I.C. § 12–120(3). Although Associates' counterclaim prayed generally for attorney fees, it did not reference I.C. § 12–120(3). Rather, Associates steadfastly maintained below that *New York* law governs this dispute, and the district court probably viewed Associates' prayer for attorney fees in that context. By not specifically invoking I.C. § 12–120(3), Associates never gave the district court a fair opportunity to decide whether attorney fees can be awarded under an *Idaho* fee-shifting statute, in a case governed by New York law.

We will not entertain the question for the first time on appeal. *Adams v. Krueger,* 124 Idaho 74, 77, 856 P.2d 864, 867 (1993). It is the litigant's duty to not only clearly state its contentions to the trial judge, but to make such contentions, and the rulings thereon, of record so they may be reviewed on appeal. *Carey v. Lafferty,* 59 Idaho 578, 583, 86 P.2d 168, 170 (1938).

### CONCLUSION

For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of Associates and denying summary judgment for Van Velson. We also affirm the denial of attorney fees to either party. Costs to Associates.

McDEVITT, C.J., and BISTLINE, JOHNSON and TROUT, JJ., concur.